**UNITED STATES DISTRICT  COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JACOB SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FIRSTENRGY CORP. AND FIRSTENERGY SERVICE COMPANY, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| BRIAN HUDOCK AND CAMEO COUNTERTOPS, INC., | ) |
| | ) CASE NOS. 2:20-cv-03755, 03954, 03987 |
| Plaintiffs, | ) |
| | ) Judge Edmund A. Sargus |
| v. | ) |
| | ) Magistrate Judge Kimberly A. Jolson |
| FIRSTENRGY CORP., *et al*., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| JAMES BULDAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FIRSTENRGY CORP., *et al*., | ) **(JURY DEMAND ENDORSED** |
| | ) **HEREON)** |
| Defendants. | ) |
| _____ | ) |

**ANSWER OF DEFENDANT MICHAEL J. DOWLING TO PLAINTIFFS'**
**CONSOLIDATED CLASS ACTION COMPLAINT**

Defendant Michael J. Dowling submits his Answer and Defenses to Plaintiffs'

Consolidated Class Action Complaint as follows. Unless otherwise expressly indicated, Mr.

Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations regarding the actions of other individuals or entities, and therefore denies the same.

## [PLAINTIFFS'] INTRODUCTION AND SUMMARY OF ALLEGATIONS

Plaintiffs, Jacob Smith, James Buldas, Brian Hudock, and Cameo Countertops, Inc., by their undersigned counsel and pursuant to this Court's Order dated September 28, 2020, both individually and on behalf of a proposed Class of all other persons similarly situated, hereby file their Consolidated Class Action Complaint (the "Consolidated Complaint").  In this Consolidated Complaint, Plaintiffs assert federal and state law claims against the following Defendants: FirstEnergy Corp. ("FirstEnergy"), an Ohio-based public utility holding company; FirstEnergy Service Company ("FirstEnergy Service"), a subsidiary of FirstEnergy which provides legal, financial, and other corporate support services to FirstEnergy; and Ohio residents Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, and Michael J. Dowling (collectively the "Individual Defendants"), who are the hands-on managers of and oversee FirstEnergy's operations, business practices, and finances. As alleged in this Consolidated Complaint, during the Class Period, FirstEnergy, FirstEnergy Service, and the Individual Defendants knowingly and intentionally acted in concert and conspired with others who are not currently named as Defendants; namely, Larry Householder ("Householder"), Jeffrey Longstreth ("Longstreth"), Neil Clark ("Clark"), Matthew Borges ("Borges"), Juan Cespedes ("Cespedes"), and Generation Now (collectively the members of the "Householder Enterprise"), as well as other persons and entities known and unknown, being persons employed by and associated with one or more "enterprise(s)," which engaged in, and the activities of which affected interstate commerce, and did knowingly and intentionally act in concert and conspire with each other and others known and unknown to violate the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and the equivalent provisions of the Ohio Corrupt Activity Act ("OCRA"), OHIO

REV. CODE § 2923.31 et seq., that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise(s) through a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(1) and (5), and/or a "pattern of corrupt activity," as that term is defined in OHIO REV. CODE § 2923.31(E) and (I), consisting of multiple wrongful acts under 18 U.S.C. §§ 1343 and 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under OHIO REV. CODE § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery that are chargeable under OHIO REV. CODE § 2921.02. It was part of the conspiracy that Defendants, FirstEnergy and FirstEnergy Service, and the Individual Defendants, agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(c) and (d) and OHIO REV. CODE § 2923.32(A)(1). In addition, Plaintiffs also allege in this consolidated complaint that Defendants injured Plaintiffs through their criminal acts, negligence, and/or gross negligence, and are also liable to Plaintiffs based upon the equitable claim of unjust enrichment. In support of their claims for relief, as alleged in this Consolidated Complaint, Plaintiffs further state as follows:

**Plaintiffs' narrative introduction contains legal conclusions to which no response is required. To the extent a response is required, Mr. Dowling denies the allegations in the introduction to the extent they refer to him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in the introduction, and therefore denies the same.**

## <u>THE PARTIES</u>

1.     Plaintiff, Jacob Smith ("Smith"), is a legal resident of the State of Ohio and resides in Lorain County, who has been damaged by the Defendants by his payment of monthly surcharges,

as imposed by Ohio House of Representatives Bill 6 ("HB 6"), which provided massive customer/ratepayer subsidies for FirstEnergy's Davis-Besse and Perry Nuclear Power Plants. Smith owns the home with his wife, in whose name the electric service is placed. Smith pays the monthly electric bill and is, therefore, the person who has suffered damages.

**Mr. Dowling denies that he damaged Plaintiff Smith. Further answering, Mr. Dowling avers that HB 6 speaks for itself. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1, and therefore denies the same.**

2.      Plaintiff, James Buldas ("Buldas"), is a legal resident of the State of Ohio and resides in Lucas County, who has been injured by the Defendants by his payment of monthly surcharges, as imposed by HB 6. Buldas owns the home with his wife, in whose name the electric service is placed. Buldas pays the monthly electric bill and is, therefore, the person who has suffered damages.

**Mr. Dowling denies that he injured Plaintiff Buldas. Further answering, Mr. Dowling avers that HB 6 speaks for itself. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2, and therefore denies the same.**

3.      Plaintiff, Brian Hudock ("Hudock"), is a legal resident of the State of Ohio and resides in Lucas County, who has been injured by the Defendants by his payment of monthly surcharges, as imposed by HB 6. Hudock owns the home with his wife, in whose name service is placed. Hudock pays the electric bill and is, therefore, is the party who has suffered damages.

**Mr. Dowling denies that he injured Plaintiff Hudock. Further answering, Mr. Dowling avers that HB 6 speaks for itself. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 3, and therefore denies the same.**

4.      Plaintiff, Cameo Countertops, Inc. ("Cameo"), is a for profit, active corporation incorporated in the State of Ohio, whose principal place of business and headquarters is located in

4

Lucas County. Cameo has been injured by the Defendants by its payment of monthly surcharges, as imposed by HB 6.

> **Mr. Dowling denies that he injured Plaintiff Cameo. Further answering, Mr. Dowling avers that HB 6 speaks for itself. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4, and therefore denies the same.**

5.      Defendant, FirstEnergy, is a public utility holding company which directs and controls various subsidiary entities organized under the laws of the State of Ohio with its principal place of business located in Akron, Ohio. FirstEnergy is involved in the generation, transmission, and distribution of electricity. Its agent for service of process is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio.

> **Mr. Dowling, upon information and belief, states that FirstEnergy Corp. is an Akron, Ohio-based public utility holding company involved in the transmission and distribution of electricity. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5, and therefore denies the same.**

6.      Defendant, FirstEnergy Service, is organized under the laws of the State of Ohio with its principal place of business located in Akron, Ohio. FirstEnergy Service provides legal, financial, and other corporate support services to affiliated companies, including FirstEnergy. At all times relevant to this case, FirstEnergy Service was under the control of FirstEnergy's corporate management. FirstEnergy Service does not have its own Chief Executive Officer or Board of Directors. This Defendant's agent for service of process is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio.

> **Mr. Dowling, upon information and belief, states that FirstEnergy Service is a corporation with its principal place of business in Akron, Ohio, it is owned by FirstEnergy Corp., it does not have its own Chief Executive Officer or Board of Directors, and it provides legal, financial, and other corporate support services to various entities. Mr. Dowling denies any allegations to the extent they refer to him. Further answering, Mr. Dowling is without knowledge or information sufficient to**

form a belief as to the truth of the remaining allegations in paragraph 6, and therefore denies the same.

7.      At all times relevant to this case, the Individual Defendants, and each of them, ran FirstEnergy and FirstEnergy Service as hands-on managers, overseeing these corporate entities' operations, business practices, and finances. During the Class Period, Defendant, Charles E. Jones ("Jones"), served as Chief Executive Officer ("CEO") and as a Director of FirstEnergy. Defendant, James F. Pearson ("Pearson"), served as Chief Financial Officer ("CFO") of FirstEnergy until March 2018, at which time he transitioned to Vice President of Finance until his retirement on April 1, 2019. Defendant, Steven E. Strah ("Strah"), is President and acting CEO of FirstEnergy. He previously served as CFO from March 2018 until he transitioned to his current position in May 2020. Defendant, K. Jon Taylor ("Taylor"), took over as CFO from Strah. Prior to assuming this position, he was FirstEnergy's Controller and Chief Accounting Officer until March 2018, after which he became President of FirstEnergy's Ohio Operations and, in 2019, its Vice President of Utilities Operations. Defendant, Michael J. Dowling, is the Senior Vice President, External Affairs, and is a member of the FirstEnergy Leadership Council. At all times relevant to this case, the Individual Defendants had intimate knowledge about the core aspects of FirstEnergy's and FirstEnergy Service's financial and business operations, including their nuclear operations and the wrongful activities alleged in the related criminal proceedings that are pending in this District entitled United States v. Larry Householder et al., Case No. 1:20-cr-077 (the "Householder Criminal Case"). The Indictment in the Householder Criminal Case, which was filed in this District on July 31, 2020, is attached hereto as Exhibit 1 and is incorporated herein by reference. The Criminal Complaint and Affidavit in Support of a Criminal Complaint (collectively the "Criminal Complaint"), which were filed in the Householder Criminal Case on or about July 21, 2020, are also incorporated herein by reference and attached hereto as Exhibit 2.

**Mr. Dowling admits that he was the Senior Vice President, External Affairs of FirstEnergy and was a member of the FirstEnergy Leadership Council until October 29, 2020. Mr. Dowling, upon information and belief, states that Charles E. Jones served as CEO and a Director of FirstEnergy Corp. between 2015 and 2020; James Pearson served as CFO of FirstEnergy Corp. until March 2018, when he transitioned to Vice President of Finance until his retirement on April 1, 2019; Steven E. Strah is President and acting CEO of FirstEnergy Corp. and previously served as CFO (March 2018–May 2020) and President (May 2020–February 2021); K. Jon Taylor became CFO in May 2020 following Strah and was FirstEnergy's Controller and Chief Accounting Officer until March 2018, after which he became President of FirstEnergy's Ohio Operations and, in 2019, its Vice President of Utilities Operation. Mr. Dowling lacks knowledge or information sufficient to form a belief as to the definition of the "Class Period" because the Complaint fails to define it and therefore denies the same. Mr. Dowling admits that copies of the Indictment and Criminal Complaint (the "Charging Documents") in *United States v. Larry Householder et al.*, Case No. 1:20-cr-077 are attached to the Complaint. Mr. Dowling is not named as a Defendant in the Charging Documents. Mr. Dowling denies that he engaged in any wrongdoing. Mr. Dowling further denies that he had knowledge of any wrongful activities alleged in the Charging Documents. To the extent any remaining allegations in paragraph 7 refer to Mr. Dowling, the allegations are denied. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7, and therefore denies the same.**

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 1961-1968. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in this Court because this is a District in which a substantial part of the events giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2). Venue is further proper because this is a District in which the registered agent for Defendants, FirstEnergy and FirstEnergy Service, namely, CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio, is found or transacts its affairs, as provided in 18 U.S.C. §1965(a).

**In response to paragraph 8, Mr. Dowling does not contest jurisdiction or venue.**

## GENERAL STATEMENT OF THE LAW

9. In this Consolidated Complaint, Plaintiffs assert claims against each of the Defendants for substantive violations and conspiracy to violate RICO and OCRA. The relevant statutory provisions, namely, Section 1962(c) and (d) of RICO, provide as follows:

> (c)  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .
>
> (d)  It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . . (c) of this section.

The equivalent provisions of OCRA may be found in OHIO REV. CODE § 2923.32(A)(1). Section 1961 of RICO defines the terms "enterprise" and "pattern of racketeering activity," as used in Section 1962, as follows:

> (4)  "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
>
> (5)  "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity.

The equivalent provisions of OCRA may be found in OHIO REV. CODE § 2923.31(C) and (E).

Section 1961(1) of RICO defines "racketeering activity", in relevant part, as follows:

> (A)  [A]ny act or threat involving . . . bribery[,] . . . which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under . . . title 18, United States Code: . . . section 1343 (relating to wire fraud) . . . section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering) . . . section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity) . . . .

The equivalent provisions of OCRA may be found in OHIO REV. CODE § 2923.31(I).

**Mr. Dowling avers that Plaintiffs purport to cite statutory provisions, which speak for themselves. Mr. Dowling denies that he violated RICO and OCRA, including any statutes cited in paragraph 9. Except as expressly admitted, the allegations in this paragraph are denied.**

10.      On or about July 21, 2020, the Criminal Complaint was filed by the United States of America against the members of the "Householder Enterprise" – namely, Householder, Longstreth, Clark, Borges, Cespedes, and Generation Now. The Criminal Complaint charges that the members of the Householder Enterprise violated RICO, 18 U.S.C. §1962(d), by conspiring to participate, directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity. Based upon information and belief, Plaintiffs allege that Defendant, FirstEnergy, is "Company A Corp.," as identified in the Criminal Complaint, and that Defendant, FirstEnergy Service, is "Company A Service Co.," as identified in the Criminal Complaint. On July 31, 2020, the members of the Householder Enterprise who were identified in the Criminal Complaint were charged in the Indictment with having violated RICO. (Note: The members of the Householder Enterprise are not named as Defendants in this Consolidated Complaint; however, consistent with the provisions of Rule 15 of the Federal Rules of Civil Procedure, Plaintiffs reserve the right, after appropriate and sufficient fact discovery has been conducted, to seek leave of Court to name additional Defendants in this case.)

**Paragraph 10 purports to describe the Charging Documents, which speak for themselves. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Except as expressly admitted, the allegations is this paragraph are denied.**

## FACTUAL ALLEGATIONS

11.      Plaintiffs incorporate by reference the factual allegations set forth in the Indictment and the Criminal Complaint, which are attached hereto as Exhibit 1 and Exhibit 2, respectively.

**Mr. Dowling incorporates by reference his responses in the preceding paragraphs. Paragraph 11 also purports to incorporate by reference the allegations set forth in**

**the Charging Documents. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents.**

12.     From about March 2017 to March 2020, the Householder Enterprise, as described and defined in the Criminal Complaint and the Indictment, received approximately $60 million in illicit and unlawful payments via interstate wire transfers from FirstEnergy and/or FirstEnergy Service, paid through Generation Now and controlled by Householder and the members of the Householder Enterprise. The specific payments made between March 16, 2017, and March 3, 2020, and the method of payment (either by wire transfer or check) are identified in Table 1 (Paragraph 47) of the Criminal Complaint, which is incorporated herein by reference. In exchange for these illicit and unlawful payments, the Householder Enterprise helped pass HB 6, described by a Householder Enterprise member as a billion-dollar "bailout" that saved from closure two supposedly failing nuclear power plants in Ohio affiliated with FirstEnergy, together with other substantial benefits to FirstEnergy and harms to its ratepayers. The members of the Householder Enterprise then worked together to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme, the Householder Enterprise passed illicit and unlawful money received from FirstEnergy and/or FirstEnergy Service through multiple entities that it controlled. The members of the Householder Enterprise then used these illicit and unlawful payments to further the goals of that Enterprise, which include (a) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of illicit and unlawful payments; (b) enriching and benefitting the Householder Enterprise, its members, and its associates; and (c) promoting, concealing, and protecting purposes (a) and (b) from public exposure and possible federal and/or state criminal prosecution.

**Paragraph 12 purports to describe and cite to the Charging Documents. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Further answering, Mr. Dowling denies any remaining**

10

**allegations in paragraph 12 to the extent they are intended to refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 12, and therefore denies the same.**

## BACKGROUND

13.     In 1999, the Ohio Electric Restructuring Act (SB 3) authorized the 2001 deregulation of the electric power industry and encouraged the development of a competitive wholesale market for electric power generation in Ohio. The restructuring required electric utilities to separate or "unbundle" their services and charges for electricity generation, transmission, and distributions and to allow retail customers to choose their electric retail suppliers.

**Mr. Dowling avers that paragraph 13 purports to reference the Ohio Electric Restructuring Act (SB 3), which speaks for itself. Except as expressly admitted, the allegations in this paragraph are denied.**

14.     Following its passage, an electric bill in Ohio became partially deregulated—the bill itemized separate costs for generation, transmission, distribution, and various "riders" authorized by the Public Utilities Commission of Ohio ("PUCO").

**Mr. Dowling avers that paragraph 14 purports to reference the Ohio Electric Restructuring Act (SB 3), which speaks for itself. Except as expressly admitted, the allegations in this paragraph are denied.**

15.     While the stated goal of this legislative effort was to cultivate an open market, the effort proved unprofitable for many utilities, resulting in customers of these utilities being saddled with higher bills. In addition, the wholesale market never developed.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 15, and therefore denies the same.**

16.     In May 2008, the General Assembly passed Senate Bill 221 (SB 221) to correct the utility legal framework and the lack of wholesale electric market development. SB 221 focused on providing stable and predictable electricity rates, development of renewable energy technologies,

11

and an increase in energy efficiency through clean energy standards. Under SB 221, PUCO once again regained oversight of electric utilities.

**Mr. Dowling avers that paragraph 16 purports to reference Ohio Senate Bill 221, which speaks for itself. Except as expressly admitted, the allegations in this paragraph are denied.**

17.    Additionally, SB 221 established Ohio's clean energy standards. The standards required utilities to meet 12.5 percent of electricity demand with renewable resources and to decrease energy use by more than 22 percent through energy-efficiency programs by 2025. These changes were touted as being beneficial to the environment and a mechanism to provide significant cost savings to all Ohio customers—both residential and commercial.

**Mr. Dowling avers that paragraph 17 purports to reference Ohio Senate Bill 221, which speaks for itself. Except as expressly admitted, the allegations in this paragraph are denied.**

18.    SB 221 also allowed utilities to impose additional charges for costs incurred in complying with energy efficiency mandates.

**Mr. Dowling avers that paragraph 18 purports to reference Ohio Senate Bill 221, which speaks for itself. Except as expressly admitted, the allegations in this paragraph are denied.**

19.    Following the passage of SB 221, two trends emerged: (1) natural gas became cheaper, and (2) clean energy standards correlated to significant cost savings for customers.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19, and therefore denies the same.**

20.    Although natural gas became cheaper, FirstEnergy had no natural gas generation.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20, and therefore denies the same.**

21.     Meanwhile, reports filed with PUCO showed that from 2009 to 2012 energy efficiency programs resulted in more than $1 billion in savings for customers. At that time, projections showed customers could realize $4 billion in savings over a ten-year period[1].

**Mr. Dowling avers that paragraph 21 purports to reference reports filed with PUCO and testimony concerning SB 310, which speak for themselves. Mr. Dowling is without knowledge or information sufficient to form a belief as to any remaining allegations in paragraph 21, and therefore denies the same.**

22.     In a 2013 report on Ohio Energy Efficiency Standards, the American Council for an Energy Efficient Economy reported that if SB 221's energy efficiency standards continued, Ohioans could save $5.6 billion. Ohio saw a similar increase in energy efficiency related employment, predominantly in the construction sector. These were enormous economic benefits to the state.

**Mr. Dowling avers that paragraph 22 purports to reference a 2013 report on Ohio Energy Efficiency Standards by the American Council for an Energy Efficient Economy, which speaks for itself. Mr. Dowling is without knowledge or information sufficient to form a belief as to the remaining allegations regarding energy efficiency in paragraph 22, and therefore denies the same.**

23.     Upon information and belief, cost savings for customers from energy efficiency concomitantly meant decreased profits for FirstEnergy.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23, and therefore denies the same.**

24.     In 2014, FirstEnergy aggressively lobbied for Senate Bill 310's (SB 310) freeze on the clean energy standards so that FirstEnergy would not have to continue meeting the increased standards. Upon information and belief, FirstEnergy's support of SB 310 was motivated by a continuing decrease in revenue associated with energy efficiency.

---

[1] *See* Testimony of Kim Bojko, "Am.Sub. Senate Bill 310, "Testimony before the Public Utilities Committee of the Ohio House of Representatives, May 14, 2014, available at http://www.ohiomfg.com/wp-content/uploads/2014-05-20_LB_Energy_SB-310-will-increaseKB.pdf (last visited October 1, 2020).

**Mr. Dowling, upon information and belief, states that FirstEnergy lobbied for SB 310. Mr. Dowling denies for want of knowledge or because they are not true the remaining allegations in paragraph 24.**

25.     In June 2014, backed by substantial FirstEnergy support, SB 310 was signed into law.

**Mr. Dowling, upon information and belief, states that SB 310 was signed into law in 2014. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25, and therefore denies the same.**

26.     Despite passage of SB 310, however, FirstEnergy's revenue and profits continued to decline.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the allegations in paragraph 26, and therefore denies the same.**

27.     By 2016, FirstEnergy painted a grim picture of the future of its nuclear power plants. In its November 2016 Annual Report to Shareholders, FirstEnergy and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate. Given this backdrop, FirstEnergy and the Individual Defendants announced future options for its energy generation portfolio as follows: "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

**Mr. Dowling avers that paragraph 27 purports to reference FirstEnergy Corp.'s November 2016 Annual Report to Shareholders, which speaks for itself. Mr. Dowling denies, as phrased, any allegations in paragraph 27 to the extent they refer to him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27, and therefore denies the same.**

28.     Consistent with this forecast, FirstEnergy and the Individual Defendants actively sought a "legislative solution" for its two affiliated nuclear power plants in Ohio. For example,

during FirstEnergy's fourth-quarter 2016 earnings conference call, Defendant Jones, its President

and CEO stated:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

**Mr. Dowling avers that paragraph 28 purports to selectively quote from FirstEnergy Corp.'s fourth-quarter 2016 earnings conference call, which speaks for itself. Further answering, Mr. Dowling denies, as phrased, any allegations in paragraph 28 to the extent they refer to him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28, and therefore denies the same.**

29.     However, attempts to obtain a legislative solution had failed to pass, including the

ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178,

Senate Bill 128, and House Bill 381 in 2017.

**Mr. Dowling avers that paragraph 29 purports to reference the Zero-Emissions Nuclear Resource Program energy proposals outlines in HB 178, SB 128, and HB 381, which speak for themselves. Except as expressly admitted, the allegations in this paragraph are denied.**

30.     While FirstEnergy was in search of a solution to its self-described nuclear energy

problem, Householder was re-entering politics, winning back his State House seat in Perry County,

Ohio, with the goal of winning back the Speakership of the House in January 2019. Following his

January 2017 trip to the Presidential inauguration on FirstEnergy's private corporate jet, on or

about March 16, 2017, Householder began receiving quarterly $250,000 payments from

FirstEnergy and/or FirstEnergy Service into a bank account in the name of a Section 501(c)(4)

entity secretly controlled by Householder called "Generation Now." During 2017 and 2018, the Householder Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from FirstEnergy and/or FirstEnergy Service. Members of the Householder Enterprise used these payments for their own personal benefit and to gain support for Householder's political bid to become Speaker of the House. During the Spring and Fall of 2018, the Householder Enterprise spent millions of dollars of FirstEnergy's money to support Ohio House of Representatives candidates involved in primary and general elections whom the members of the Householder Enterprise believed both would vote for Householder as Speaker. Ten of Householder's candidates were ultimately elected as freshmen to the 2019-2020 House of Representatives, all of whom voted for Householder as Speaker, and nine of whom voted for bailout legislation for FirstEnergy.

**Mr. Dowling admits that Larry Householder traveled to Washington D.C. in January 2017 on a FirstEnergy plane and avers that Householder reimbursed the company for the cost of the travel. Further answering, Mr. Dowling admits, upon information and belief, that FirstEnergy Service Company contributed four payments of $250,000 to Generation Now at various times in 2017. Mr. Dowling denies the remaining allegations in paragraph 30 to the extent they refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 30, and therefore denies the same.**

31.     Householder-backed candidates that benefitted from FirstEnergy's money received by Generation Now (described throughout this Consolidated Complaint and the Criminal Complaint and Indictment as "FirstEnergy-to-Generation Now" payments) helped elect Householder as the Speaker of the House in January 2019. Householder fulfilled his end of the corrupt bargain shortly thereafter. Just three months into his term as Speaker, HB 6 was introduced to save from closure FirstEnergy's two supposedly failing nuclear power plants. Specifically, HB 6 subsidized nuclear energy (and coal) operations in Ohio and Indiana through a monthly surcharge on all Ohio residents' energy bills. Householder Enterprise member Clark described the legislation as a "bailout" for FirstEnergy's nuclear assets worth at least $1.3 billion to FirstEnergy.

16

**Mr. Dowling admits that Larry Householder was elected as Speaker of the House in January 2019. Paragraph 31 also purports to reference HB 6, which speaks for itself. Mr. Dowling denies the remaining allegations in paragraph 31 to the extent they are intended to refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31, and therefore denies the same.**

32.     After the introduction of the bailout legislation, FirstEnergy, which was under the management and control of the Individual Defendants, began increasing its payments into Generation Now for the benefit of the Householder Enterprise and its members. On April 30, 2019, roughly two weeks after introduction of the legislation, the Individual Defendants caused FirstEnergy to wire transfer $1.5 million in illicit and unlawful payments to Generation Now. During May 2019, while the controversial legislation was pending before the Ohio Legislature, the Individual Defendants caused FirstEnergy to wire transfer four additional illicit and unlawful payments totaling $8 million. The Householder Enterprise used some of that money for mailers and media advertisements to pressure members of the House to support the legislation; the Householder Enterprise members also used FirstEnergy's money for their personal benefit, as described in this Consolidated Complaint and in the Criminal Complaint and Indictment. In the same month that the Householder Enterprise received $8 million in illicit and unlawful payments from FirstEnergy, Householder and other Householder Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages sent by Householder after Householder's attempt to gain support for HB 6 from that representative.

**Mr. Dowling denies the allegations in paragraph 32 to the extent they refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32, and therefore denies the same.**

33.     On May 29, 2019, HB 6 passed the House of Representatives and, after Householder Enterprise members exerted pressure on the Senate, the legislation was passed and

was signed into law by Governor DeWine. That process took just two months; however, the law would not go into effect until October 22, 2019, because Ohio's voters have a constitutional right to reject such legislation by referendum. Shortly after the Governor signed the legislation, a campaign began to organize a statewide ballot-initiative referendum (the "Ballot Campaign") in order to overturn the legislation. This effort required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum of HB 6 on the November 2020 ballot.

> **Mr. Dowling avers that paragraph 33 purports to reference the legislative history of HB 6, which speaks for itself. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 33, and therefore denies the same.**

34. In response, the Individual Defendants caused bank accounts controlled by FirstEnergy to wire transfer over $38 million in illicit and unlawful payments into Generation Now to defeat the ballot initiative so that HB 6 would go into effect. The members of the Householder Enterprise funneled this money to various accounts and entities that they controlled in order to purchase media advertisements and mailers against the Ballot Campaign, to conflict out signature-collection firms, and to pay off and bribe signature collectors who were seeking signatures to support the referendum. The members and associates of the Householder Enterprise also used FirstEnergy's illicit and unlawful payments to enrich themselves and further their own personal interests.

> **Mr. Dowling denies the allegations in paragraph 34 to the extent they refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34, and therefore denies the same.**

35. The Individual Defendants caused FirstEnergy and/or FirstEnergy Service to wire transfer to the Householder Enterprise and/or its members and/or their affiliates a total of

18

$60,886,835.86 in illicit and unlawful payments over the approximately three-year period in exchange for the billion-dollar bailout. The Individual Defendants and the members of the Householder Enterprise concealed the illicit and unlawful payments by using a Section 501(c)(4) "charitable" organization to receive the bribe money, and then transferring the payments internally to a web of related entities and accounts. The millions of dollars paid into the entity are akin to bags of cash; unlike campaign contributions or political action committee ("PAC") contributions, they were not regulated, not reported, not subject to public scrutiny, and the members of the Householder Enterprise freely spent the bribe payments to further their political interests and to enrich themselves. As Householder Enterprise member Clark stated in a 2019 recorded conversation that was reproduced in the Criminal Complaint, "Generation Now is the Speaker's (c)(4)," and FirstEnergy's "deep pockets," and the money that was wire transferred to the Householder Enterprise through Generation Now was "unlimited." Householder Enterprise member Borges similarly described FirstEnergy's illicit and unlawful payments to the Householder Enterprise as "Monopoly money."

> **Mr. Dowling avers that paragraph 35 purports to selectively quote from the Criminal Complaint, which speaks for itself. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. To the extent the allegations in paragraph 35 refer to actions by Mr. Dowling, the allegations are denied. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35, and therefore denies the same.**

36. The members of the Householder Enterprise used some of FirstEnergy's money to help enact the bailout legislation. Additionally, the Householder Enterprise used millions of dollars of FirstEnergy's illicit and unlawful payments to further Householder's political ambitions by funding his political campaign, and the campaigns of members and candidates who would eventually support Householder's election for Speaker. FirstEnergy's illicit and unlawful payments

funded the operating costs of the Householder Enterprise and paid for Householder's political and campaign staff. Householder, Longstreth, Clark, Borges, Cespedes, and/or Generation Now also paid themselves personally millions of dollars in bribe payments, funneled through Generation Now and other entities controlled by the Householder Enterprise. This includes allowing for the payment of at least $500,000 in personal benefits to Householder that was passed through Longstreth-controlled bank accounts. In addition, the members of the Householder Enterprise had over $8 million of FirstEnergy's money in their controlled bank accounts at the end of 2019, which represents further profit to the members of the Householder Enterprise.

**Mr. Dowling denies the allegations in paragraph 36 to the extent they refer to actions by him. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36, and therefore denies the same.**

## THE HOUSEHOLDER ENTERPRISE

37. Until he was removed from that position by a unanimous vote on July 30, 2020, Householder was the current Speaker of the Ohio House of Representatives at all times relevant to this case. He previously served as a House member, representing Ohio's 72nd District from 1997 to 2004, including as Speaker of the House from 2001 to 2004. Householder resigned from office after reports of alleged corrupt activity surfaced in the media and were publicly referred to the FBI; however, he was not charged at that time. Householder won his House seat back in the Fall of 2016. He was elected Speaker again in January 2019, after what the Ohio media described as a bitter leadership battle that lasted nearly a year.

**Mr. Dowling avers that Larry Householder's legislative career history speaks for itself. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37, and therefore denies the same.**

38. Householder's path to the Speakership was unusual. Householder and another representative, both of whom are Republicans, were candidates to be Speaker of the House for the

133rd General Assembly. After the then-Speaker's resignation in May 2018, a protracted conflict began to select a Speaker for the remainder of the 132nd General Assembly. Ultimately, the other representative became Speaker pending the upcoming 2018 election, after the unprecedented conflict that was resolved using a House rule that could only be employed after ten failed attempts to select a Speaker. Despite the other representative's selection in mid-2018 to serve as House Speaker for the remainder of the 132nd General Assembly, Householder aggressively sought support for his candidacy for Speaker. He did so in a number of ways, including by providing financial support, paid for in large part by FirstEnergy and/or FirstEnergy Service, to certain candidates running for House seats in the Spring 2018 primary and the November 2018 general election. In the end, his strategy was successful because he won the Speakership despite another representative serving in that role prior to the 2018 election.

**Mr. Dowling avers that Larry Householder's legislative career history speaks for itself. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38, and therefore denies the same.**

39.    The Householder Enterprise had several purposes, one of which was to increase Householder's political power through corrupt means. In his role, Householder solicited and accepted payments from FirstEnergy into his Section 501(c)(4) account; he used the bribe payments to further his political interests, enrich himself and other members and associates of the Householder Enterprise, and to assist in passing and preserving the bailout legislation; and, in return for the benefits received, he coordinated passage of HB 6 and attempted to influence legislators to support the bailout, among other things.

**Mr. Dowling denies the allegations in paragraph 39 to the extent they refer to actions by him. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 39, and therefore denies the same.**

40.     Householder benefitted personally from the activities of the Householder Enterprise. For example, while funded by FirstEnergy-to-Generation-Now payments, at least $300,000 passed through and funded bank accounts controlled by Longstreth, which the Householder Enterprise used to pay legal fees and settle a personal lawsuit against Householder. Over $100,000 of the FirstEnergy-to-Generation-Now payments passed through bank accounts controlled by Longstreth and used to pay costs associated with Householder's Florida home. In addition, at least $97,000 of the FirstEnergy-to-Generation-Now payments was used to pay expenses for Householder's 2018 political campaign.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40, and therefore denies the same.**

41.     Longstreth is Householder's longtime campaign and political strategist. Clark identified Longstreth as Householder's "political guy," his "implementer," and one of his "closest advisors," who was instrumental to the Householder Enterprise's efforts to pass HB 6.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41, and therefore denies the same.**

42.     Although Longstreth is not employed by the State of Ohio, he has been Householder's chief political strategist for many years. He ran Householder's political campaign, and he and his staff managed the 2018 campaigns for the Householder Enterprise-backed candidates (at times internally referred to by members of the Householder Enterprise as "Team Householder" candidates). Householder and Longstreth shared office space that was rented from their Political Advertising Agency. In addition, Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for FirstEnergy and the Individual Defendants.

**To the extent the allegations in paragraph 42 refer to actions by Mr. Dowling, the allegations are denied. Mr. Dowling is without knowledge or information sufficient to**

**form a belief as to the truth of the remaining allegations in paragraph 42, and therefore denies the same.**

43.     Longstreth also played a critical role with respect to the Householder Enterprise's finances. He was a signatory on both of the Generation Now bank accounts and the person who transferred money out of the accounts to other entities to further the Householder Enterprise. Longstreth also controlled entities that received FirstEnergy-through-Generation Now payments to further the Householder Enterprise. Among these entities, Longstreth owns and operates JPL & Associates. Throughout the relevant period, Longstreth transferred over $10.5 million of FirstEnergy's illicit and unlawful payments directly from Generation Now's primary bank account to JPL & Associates' primary bank account. In addition, Longstreth received indirectly another $4.4 million, which was transferred from the Generation Now account through another entity and then into bank accounts that he controlled. Longstreth then used FirstEnergy's illicit and unlawful payments funneled through Generation Now to further Householder's and FirstEnergy's interests and to pay personal benefits to members and associates of the Householder Enterprise. Longstreth benefitted personally through the conspiracy's actions, receiving over $5 million in FirstEnergy-to-Generation-Now payments during the relevant period, including at least $1 million, which he transferred to his brokerage account in January 2020.

**Mr. Dowling denies the allegations in paragraph 43 to the extent they refer to actions by him. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 43, and therefore denies the same.**

44.     Clark owns and operates Grant Street Consultants, an Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse. Prior to becoming a lobbyist, Clark served as a budget director for the Ohio Senate Republican Caucus. During the relevant period, Clark worked as a lobbyist for various political interest groups.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44, and therefore denies the same.**

45. Along with Longstreth, Clark is, in his own words, one of Householder's "closest advisors." According to Clark's admissions, made during recorded conversations in 2019, he served as Householder's "proxy" in the Householder Enterprise's efforts to further the enactment of HB 6 an ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge. Clark also communicated directly with House members to further the Householder Enterprise. In 2019, Clark described himself in recorded communications as Householder's "hit man" who will do the "dirty shit." Clark stated that "when [Householder's] busy, I get complete say. When we're working on stuff, if he says, 'I'm busy,' everyone knows. Neil has the final say, not Jeff. Jeff is his implementer." Borges confirmed Clark's role, and similarly described Clark as Householder's "proxy" relating to FirstEnergy matters. Clark benefitted personally from FirstEnergy's illicit and unlawful payments to the Householder Enterprise, receiving at least $290,000 in FirstEnergy-to-Generation-Now payments.

**Mr. Dowling denies the allegations in paragraph 45 to the extent they refer to actions by him. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 45, and therefore denies the same.**

46. Borges is a registered lobbyist for a subsidiary of FirstEnergy. He was a key middleman and was at the center of the effort to thwart the referendum to stop HB 6 from taking effect through a ballot-initiative drive. On August 5, 2019, shortly after the Ballot Campaign was announced, Borges incorporated 17 Consulting Group. Two days later, Borges opened a bank account for 17 Consulting Group, and that same day Generation Now wired $400,000 into that bank account. Over the next few months, Generation Now wired a total of $1.62 million into that bank account.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46, and therefore denies the same.**

47.     Approximately one month after Generation Now began wire transferring money into Borges' 17 Consulting Group's bank account, Borges paid $15,000 in exchange for inside information about the Ballot Campaign, which Borges would use to help defeat the Ballot Campaign. Bank account records show that the $15,000 paid came from the 17 Consulting Group bank account, which was funded by Generation Now wire transfers. Borges also paid Cespedes $600,000 of Generation Now money from his bank account. With the money that had been wire transferred from Generation Now, Borges also paid a private investigator during this period, which, as described below, is consistent with the Householder Enterprise's strategy of investigating the signature collectors that worked for the Ballot Campaign.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 47, and therefore denies the same.**

48.     Borges was in frequent contact with Householder in January 2019 and April 2019 – key time-periods, as described below, involving official action by Householder. Borges benefitted directly from the $1.62 million from Generation Now wire transfers. Specifically, he paid himself over $350,000 from FirstEnergy-to-Generation-Now payments.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48, and therefore denies the same.**

49.     Cespedes served as a key middleman, participating in strategy meetings and communicating with Householder Enterprise members and associates regarding strategic decisions. Cespedes is a multi-client lobbyist, whose services were retained by a subsidiary of FirstEnergy. Cespedes was essential to FirstEnergy's efforts to get the bailout legislation passed in Ohio. As explained in this Consolidated Complaint and in the Criminal Complaint and the Indictment, a contract between this company and Cespedes' lobbying firm, the Oxley Group,

25

shows this company hired Cespedes to pursue the bailout legislation starting in the Spring of 2018. Consistent with this effort, records show that Cespedes was the "lead consultant" relating to attempts to pursue legislation would save FirstEnergy's supposedly failing nuclear power plants. In internal documents, Cespedes tracked "Team Householder" candidates who later received FirstEnergy-to-Generation-Now money, and he advised that if Householder became the Speaker, the nuclear energy bailout "will likely be led from his Chamber."

**Mr. Dowling avers that Paragraph 49 purports to reference the Charging Documents, which speak for themselves. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 49, and therefore denies the same.**

50.     Cespedes received approximately $600,000 from the Householder Enterprise and $227,000 from FirstEnergy in 2019. He also was in regular contact with the Individual Defendants and Householder Enterprise members during the relevant period. Cespedes Jeff Longstreth communicated regularly via cellphone text messages discussing the coordination of millions of dollars in FirstEnergy's illicit and unlawful payments to the Householder Enterprise, attaining public officials' support for the bailout, sending media and mailers supporting the bailout legislation, and hiring signature firms to defeat the ballot campaign, among other things. Cespedes coordinated the timely payment of $15 million from FirstEnergy to Generation Now.

**To the extent the allegations in paragraph 50 refer to actions by Mr. Dowling, the allegations are denied. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 50, and therefore denies the same.**

51.     Generation Now received approximately $60 million in illicit and unlawful payments from FirstEnergy and/or FirstEnergy Service during the relevant period. (Each of the payments, and the mode of each payment made, is identified with specificity in Table 1 (Paragraph 47) of the Criminal Complaint.) As set forth more fully below, Generation Now registered with the

Internal Revenue Service ("IRS") as a Section 501(c)(4) organization, which is an IRS designation for a tax-exempt social welfare organization. Under federal law, the names and addresses of contributors to Section 501(c)(4) organizations are not made available for public inspection. The members of the Householder Enterprise concealed the bribery scheme by funneling the money through Generation Now, which hid the payments and the scheme from public scrutiny. Generation Now's bank accounts had a combined balance of approximately $1.67 million as of January 1, 2020, money that is a direct benefit to the Householder Enterprise. As described in this Consolidated Complaint and in the Criminal Complaint and Indictment, after making wire transfers to Coalition in early 2020, the Generation Now accounts were replenished by a $2 million wire transfer from Energy Pass-Through (a non-profit Section 501(c)(4) organization that was incorporated in Ohio on February 28, 2017, two days after Generation Now was incorporated in Delaware) in March 2020, bringing the combined balance of the accounts to approximately $2.9 million, again, money that is a direct benefit to the Householder Enterprise.

**Mr. Dowling avers that paragraph 51 purports to reference the Charging Documents, which speak for themselves. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling admits that Generation Now was registered as a 501(c)(4) organization. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 51, and therefore denies the same.**

## RELATED ENTITIES CONTROLLED BY THE HOUSEHOLDER ENTERPRISE

52.     The Householder Enterprise used and relied on a number of different entities to further the conspiracy alleged in this Consolidated Complaint and in the Criminal Complaint and the Indictment. The following entities were controlled by, worked directly with, or funneled illicit and unlawful payments for the benefit of the Householder Enterprise:

**Mr. Dowling avers that paragraph 52 purports to reference the Charging Documents, which speaks for themselves.  Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling denies**

**the allegations in paragraph 52, including all subparts, to the extent they refer to actions by him.**

a.    JPL & Associates LLC is controlled by Longstreth. He is signatory on five different bank accounts that have received money directly from Generation Now, including two JPL business accounts, one personal account, and two accounts named "Constant Content." Numerous internal money transfers to Generation Now money were made among Longstreth-controlled accounts. In total, JPL's main business account received over $10.5 million in FirstEnergy-to-Generation-Now payments during the relevant period, which Longstreth then transferred internally to his other accounts. Longstreth also received indirectly $4.4 million, which had been funneled from Generation Now, through another entity (the "Front Company" discussed below) and into Longstreth's Constant Content accounts. Analysis of the accounts by the FBI shows that the money was used to pay benefits directly to Householder Enterprise members and to further the Householder Enterprise's interests by paying campaign staff for preferred Householder Enterprise political candidates, among other things. After the ballot initiative campaign failed and HB 6 became law for the benefit of FirstEnergy, Longstreth consolidated most of the Householder Enterprise funding into JPL-controlled accounts. As of January 1, 2020, that total balances within JPL-controlled accounts exceeded $6.5 Million. This money is a direct benefit to the Householder Enterprise.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(a), and therefore denies the same.**

b.    "PAC" is a federal PAC through which Generation Now funneled FirstEnergy's illicit and unlawful payments in furtherance of the conspiracy. The Householder Enterprise primarily used the PAC during the May 2018 primary election as a way to conceal the source of media buys for "Team Householder" candidates. The attorney who is listed as the treasurer for

Generation Now and who is a signatory on the Generation Now accounts along with Longstreth, is the treasurer and a signatory of the PAC account.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(b), and therefore denies the same.**

c.      Although Longstreth was not a signatory on the PAC bank account, documents obtained by the FBI confirm Longstreth's control over the PAC. For example, a Word document titled "Client Information Request Form," last modified by Longstreth in October 2016, listed Longstreth as the "Executive Director or President" of the PAC. In addition, Longstreth's resume, created by Longstreth in November 2016, states that Longstreth oversees political activities for the PAC. Contribution forms for the PAC list Longstreth as the "Contact" and include Longstreth's e-mail address and telephone number. Toll call records corroborate Longstreth's role, showing frequent contact with the attorney when Generation Now needed to move money to and from PAC.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(c), and therefore denies the same.**

d.      In early 2018, the PAC bank account was funded almost entirely by a $250,000 wire transfer and a $750,000 wire transfer from Generation Now made on April 2 and April 12, 2018, respectively. By April 30, 2018, nearly all of the one million dollars was paid to two media services firms, which spent the money on media buys and other efforts to benefit Householder political candidates, including Householder himself, in advance of the May 8, 2018, Ohio primary election.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(d), and therefore denies the same.**

e.      The account was unused until Generation Now wired an additional $50,000 to the account in September 2018, in advance of the Fall 2018 election. Close to $40,000 of that wire

transfer was paid to a political strategy group within weeks of the wire transfer. Aside from payments to the attorney's law firm, the balance remained in the account.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(e), and therefore denies the same.**

f.     The account remained largely inactive from October 2018 until January-February 2020, when the Householder Enterprise wire transferred $1,010,000 to the "Coalition" (described below), which passed through to PAC roughly the same amount of money over the next two months. Expenditures from the PAC in Federal Election Commission filings, along with media purchased by PAC, show that the Householder Enterprise used FirstEnergy's money funneled to the PAC to benefit Team Householder candidates for the 2020 primary election.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(f), and therefore denies the same.**

g.     "Coalition" is another 501(c)(4) non-profit entity for which the attorney who is treasurer and signatory for the PAC is the signor on the Coalition's bank account. The attorney incorporated Coalition in Delaware one day after he incorporated PAC. Longstreth's resume states that he oversees political activities for the Coalition. An FBI investigation indicated that Longstreth possessed a copy of the W-9 taxpayer identification form for the Coalition. He also saved Word documents characterized as "scripts" to use when soliciting money from donors to the Coalition.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(g), and therefore denies the same.**

h.     For calendar years 2017 through 2019, the Coalition was funded almost exclusively through (1) $90,000 from First Energy, (2) $300,000 from "Energy Pass-Through" (a FirstEnergy pass-through, as set forth below), and (3) $200,000 from an interest group that was funded exclusively by $13 million from another energy company that supported HB 6 and separately paid

$150,000 to Generation Now during the relevant period. Outgoing payments from the Coalition account were over $100,000 in two wire transfers to JPL & Associates; $54,000 wired to Generation Now; $191,000 wire transferred to Media Placement Company 1; and $200,000 wire transferred to a public relations firm.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(h), and therefore denies the same.**

i.      The Coalition account was largely unused from August 2018 until January 2020 when, as described directly above, the Householder Enterprise used the Coalition as a pass-through for FirstEnergy-to-Generation-Now payments to PAC, which the Householder Enterprise then used to support Householder-backed candidates in the 2020 primary election. The benefit of passing the money through the Coalition was that the PAC listed the Coalition as the source of the $1,010,000 million in FEC filings, not Generation Now. The Householder Enterprise sought to conceal Generation Now as the source of PAC funds in 2020 for numerous reasons, including, as explained in this Consolidated Complaint and in the Criminal Complaint and the Indictment, Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it. Thus, this account is a mechanism for Generation Now to spend illicit and unlawful money for the benefit of Householder and the Householder Enterprise.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(i), and therefore denies the same.**

j.      "Dark Money Group 1" is an entity used by Householder Enterprise to conceal the source of media buys during the 2018 general election, similar to the way the Householder Enterprise used PAC for the primaries in 2018 and 2020. An Ohio lobbyist incorporated Dark

Money Group 1 in Ohio on September 21, 2018, and opened its bank account on September 25, 2018.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(j), and therefore denies the same.**

k.      The majority of activity in the account occurred roughly one month later, between October 2018 and Election Day on November 6, 2018. From October 19 to October 29, 2018, Generation Now wire transferred $670,000 into the account; FirstEnergy wire transferred $500,000 into the account; and other corporate interests wire transferred $300,000 into the account, totaling $1,470,000. From October 22 to November 2, 2018, Media Placement Company 2 then spent $1,438,510 on media buys for advertisements paid for by Dark Money Group 1 that generally targeted rivals of candidates aligned with Householder. Since Election Day in 2018, the account has been largely unused.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(k), and therefore denies the same.**

l.      "Front Company" is a pass-through entity used by the Householder Enterprise to fund the campaign against the referendum in furtherance of the conspiracy. The for-profit entity was organized in Ohio on July 30, 2019, just days after the Ballot Campaign to overturn HB 6 began.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52(l), and therefore denies the same.**

m.      From August 1, 2019, through October 2019, accounts controlled by FirstEnergy and the Individual Defendants wire transferred Generation Now $38 million; Generation Now then wired $23 million from those payments to Front Company, the vast majority of which was used to pay signature collection firms to fight against the Ballot Campaign and to pay for media opposing

the Ballot Campaign. Generation Now was the sole source of money deposited into the Front Company account. By November 2019, less than $5,000 remained in the Front Company account.

> **Mr. Dowling admits, upon information and belief, that on October 10, 2019, FirstEnergy Service Company transferred $10,000,000 to an entity, which then transferred $10,000,000 to Generation Now and that on October 18, 2019, FirstEnergy Service Company transferred $10,000,000 to an entity, which then transferred $3,00,000 to Generation Now on October 22, 2019. To the extent any allegations in paragraph 52(m) refer to actions by Mr. Dowling, the allegations are denied. Further answering, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 52(m), and therefore denies the same.**

## THE USE OF GENERATION NOW TO RECEIVE BRIBE PAYMENTS FROM FIRST ENERGY

53.     On or about February 6, 2017, Generation Now was incorporated in Delaware, and two bank accounts were opened at Fifth Third Bank (account numbers 3310 and 6847). Bank records show that an attorney and Longstreth were signatories on both accounts. On or about July 26, 2017, Generation Now registered with the Ohio Secretary of State as a foreign nonprofit corporation "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code ("the Code"), or the corresponding section of any future federal tax code." The attorney signed the application as the treasurer of Generation Now.

> **Mr. Dowling admits that Generation Now is registered as a Section 501(c)(4) organization. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53, and therefore denies the same.**

54.     Although Householder was not listed on registration documents or in account records for Generation Now, the Householder Enterprise used Generation Now to receive secret payments for Householder.

> **Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54, and therefore denies the same.**

55.     At that time, there was aggressive lobbying for legislative action to save FirstEnergy's two nuclear power plants. Table 1 in Paragraph 47 (pages 15-16) of the Criminal Complaint identifies with specificity each of FirstEnergy's illicit payments received by Generation Now during the period from March 2017 until March 2020, totaling $59,996.835.86.

**Mr. Dowling avers that paragraph 55 purports to reference the Criminal Complaint, which speaks for itself.  Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling denies the remaining allegations in paragraph 55.**

56.     In addition to the $59,996.835.86 that FirstEnergy paid directly to Generation Now, FirstEnergy made $890,000 in other illicit and unlawful payments to the Householder Enterprise, including payments of $500,000 to Dark Money Group 1 and $90,000 to Coalition, and an Energy Pass-Through payment of $300,000 to Coalition, all of which are detailed in the Criminal Complaint. These payments bring the total amount of illicit and unlawful payments from FirstEnergy and/or FirstEnergy Service to the Householder Enterprise during the relevant period as $60,886,835.86. During the scheme and conspiracy described in this Consolidated Complaint and in the Criminal Complaint and the Indictment, other entities besides FirstEnergy deposited money into Generation Now; the amounts of those deposits, however, are dwarfed by FirstEnergy's payments.

**Mr. Dowling avers that paragraph 56 purports to reference the Criminal Complaint, which speaks for itself.  Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling denies the remaining allegations in paragraph 56 to the extent they are intended to refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56, and therefore denies the same.**

57.     Although Householder's name is not on Generation Now's organizational documents, an FBI investigation concluded, based on Householder's statements, Clark's statements, and a review of documentation obtained pursuant to search warrants and grand jury

subpoenas, that Householder controlled and used Generation Now to further the Householder Enterprise's goals.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57, and therefore denies the same.**

58.     FirstEnergy and FirstEnergy Service funded Householder's Speakership bid in exchange for a legislative fix for its nuclear power plants and for other legislative relief including reimbursement and for certain losses.

**Mr. Dowling denies the allegations in paragraph 58.**

59.     The volume of FirstEnergy's payments, the timing of these payments, communications and coordination amongst co-conspirators and the Individual Defendants, the official action(s) taken by Householder, and the actions to maintain the official action, show the corrupt arrangement of FirstEnergy's funding of Householder's speakership bid in exchange for legislative fixes.

**Mr. Dowling denies the allegations in paragraph 59.**

60.     As described in this Consolidated Complaint and in the Criminal Complaint and the Indictment, the vehicle to collect the vast amounts of money needed for Householder's Speakership bid was Generation Now. From the time the Generation Now bank accounts were opened in 2017 through the November 2018 general election, the Householder Enterprise received approximately $4.6 million from illicit and unlawful payments into Generation Now. More than one-half of that money came from FirstEnergy, FirstEnergy Service, or the Energy Pass-Through, fully funded by FirstEnergy. More than one-half million of the remaining money came from energy-related entities that either had a relationship with FirstEnergy or an interest in the bailout

legislation. The remaining amount of money (approximately $1.6 million) came from approximately 31 other interest groups.

> **Mr. Dowling avers that paragraph 60 purports to reference the Charging Documents, which speaks for themselves. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 60, and therefore denies the same.**

61.     The Individual Defendants caused FirstEnergy and/or FirstEnergy Service to make regular quarterly payments of $250,000 into Generation Now's main bank account almost immediately Jeff Longstreth opened that account in 2017. But, in March 2018, approximately two weeks before FirstEnergy's corporate affiliates filed for bankruptcy, FirstEnergy began funneling payments to Generation Now through Energy Pass-Through. The illicit and unlawful payments wire transferred from FirstEnergy Service into the Energy-Pass-Through originated from account number 6496, the same account used to wire transfer payments directly from FirstEnergy Service into Generation Now. In the final month before the 2018 general election, FirstEnergy deposited another $500,000 into the Generation Now account. This time the money was paid by check from account number 4788. The payments from FirstEnergy during 2017¬2018 are summarized in Paragraph 82 (pages 25-26) of the Criminal Complaint. Other payments are described in Paragraph 83 (page 26) of the Criminal Complaint. The close coordination of illicit and unlawful activities between FirstEnergy, the Individual Defendants, and Householder is set forth in Paragraphs 84-86 (pages 26-28) of the Criminal Complaint.

> **Mr. Dowling admits, upon information and belief, that FirstEnergy Service Company contributed four payments of $250,000 to Generation Now at various times in 2017. Paragraph 61 also purports to reference the Criminal Complaint, which speaks for itself. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. To the extent any remaining allegations in paragraph 61 refer to actions by Mr. Dowling, the allegations are denied. Further answering, Mr. Dowling is without knowledge or information sufficient to form a**

**belief as to the truth of the remaining allegations in paragraph 61, and therefore denies the same.**

62.     On or about July 24, 2018, a few months after the primary elections, $215,000 was wire transferred from Longstreth-controlled accounts to settle a personal lawsuit against Householder. On August 1, 2018, the same day that Householder was meeting with FirstEnergy executives in Columbus, according to documents in Cespedes' possession, a court filing in Franklin County Court "released and forever discharged" the judgment against Householder and Householder Ltd. The main JPL account was funded with illicit and unlawful wire transfers of money from Generation Now, which was funded in large part by FirstEnergy wire transfers of money. In addition, bank records will show that JPL's main account also paid the fees of Householder's attorneys involved in the lawsuit in May 2017 via two checks totaling $60,000. At the time JPL made those payments, it had received more than $78,000 from Generation Now, which had been funded in part by a $250,000 wire from FirstEnergy and a deposit from Longstreth on the date he opened the account. JPL also paid the same law firm additional fees totaling $25,308.43 in 2018.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the allegations in paragraph 62, and therefore denies the same.**

### BAILOUT LEGISLATION PASSED FOR FIRSTENERGY

63.     The Householder Enterprise transitioned quickly to fulfilling its end of the corrupt bargain with FirstEnergy by passing nuclear bailout legislation. In fact on January 7, 2019, the day he was elected Speaker of the House, Householder pledged to create a standing subcommittee on energy generation. Householder then followed through shortly after his election as Speaker by passing the HB 6 legislation and defending the bill against the ballot initiative challenge.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63, and therefore denies the same**.

64.    The Householder Enterprise's efforts to pass the legislation and preserve it against the Ballot Campaign challenge were funded entirely by FirstEnergy and/or FirstEnergy Service, through illicit and unlawful payments to Generation Now. While HB 6 was pending in the House of Representatives, FirstEnergy wire transferred to Generation Now the sum of $9,500,000. When the bill was pending in the Senate, FirstEnergy wire transferred to Generation Now the sum of $7,358,255. In order to fund its efforts to defeat the Ballot Campaign, FirstEnergy wire transferred an additional $38,000,000 to Generation Now. The volume and frequency of these illicit and unlawful payments provide further evidence of the Householder Enterprise's corrupt arrangement with FirstEnergy, FirstEnergy Service, and the Individual Defendants. These facts, including the Householder Enterprise's passage of HB 6, its efforts to defeat the subsequent Ballot Campaign, and FirstEnergy's and/or FirstEnergy Service's involvement and coordination funding these efforts, are set forth in this Consolidated Complaint and in the Criminal Complaint and the Indictment.

**Mr. Dowling admits, upon information and belief, that on October 10, 2019, FirstEnergy Service Company transferred $10,000,000 to an entity, which then transferred $10,000,000 to Generation Now and that on October 18, 2019, FirstEnergy Service Company transferred $10,000,000 to an entity, which then transferred $3,00,000 to Generation Now on October 22, 2019. Mr. Dowling incorporates by reference his responses to any prior paragraph that purports to rely on the Charging Documents. To the extent any remaining allegations in paragraph 64 refer to actions by Mr. Dowling, the allegations are denied. Further answering, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 64, and therefore denies the same.**

## <u>HOUSE BILL 6</u>

65.    Consistent with their unlawful scheme, the members of the Householder Enterprise implemented a strategy to pass a legislative fix for FirstEnergy, FirstEnergy Service, and their related entities shortly after Householder was selected Speaker. The strategy involved ramming a sweeping piece of legislation – HB 6 – through the House and pushing the Senate to agree. First,

Householder picked freshman representatives, which he had helped to elect by using FirstEnergy-to-Generation-Now dollars for their benefit in the 2018 election, to sponsor the bill that he helped draft. Second, Householder created a new subcommittee to hear the bill, which was comprised mostly of his political supporters. Third, the members of the Householder Enterprise planned and engaged in an expensive media blitz, funded by FirstEnergy-to-Generation-Now payments, to pressure public officials to support the bill. Fourth, Householder strong-armed House members, particularly the opponents of the bill. Finally, Householder and the other members of the Householder Enterprise pressured members of the Senate to pass the legislation. The expediency and funding of this legislative effort and the tactics used by the members of the Householder Enterprise, along with timely communications between Householder Enterprise members and agents of FirstEnergy and/or FirstEnergy Service, including the Individual Defendants, are further evidence of the unholy and illicit agreement between Householder and FirstEnergy and/or FirstEnergy Service.

> **To the extent the allegations in paragraph 65 refer to actions by Mr. Dowling, the allegations are denied. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 65, and therefore denies the same.**

66. On April 12, 2019, roughly three months after Householder became Speaker, HB 6 was introduced. Although the bill was entitled "Ohio Clean Air Program," the FBI investigation shows that HB 6 was conceived to prevent the allegedly looming shutdown of FirstEnergy's nuclear power plants as explained in Paragraphs 111-186 (pages 34-62) of the Criminal Complaint.

> **Mr. Dowling avers that paragraph 66 purports to reference the legislative history of HB 6 and the Criminal Complaint, which speak for themselves. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations against in paragraph 66, and therefore denies the same.**

67.     HB 6 was important to the Householder Enterprise because it received millions of dollars into Generations Now from FirstEnergy and/or FirstEnergy Service in exchange for enactment of the bailout legislation. As a result, any referendum of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to the Householder Enterprise.

**Mr. Dowling denies the first sentence of paragraph 67. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 67, and therefore denies the same.**

68.     FirstEnergy and/or FirstEnergy Service funded and/or participated in the funding of the Householder Enterprise to defeat the Ballot Campaign to repeal HB 6, as alleged in Paragraphs 187-215 (pages 62-71) of the Criminal Complaint. The efforts to prevent the referendum and possible repeal of HB 6 included bribing an employee of the Ballot Initiative to gain inside information, and bribes to signature collectors, as detailed in Paragraphs 216-239 (pages 71-78) of the Criminal Complaint.

**Mr. Dowling avers that paragraph 68 purports to reference the Criminal Complaint, which speaks for itself. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. Mr. Dowling denies for want of knowledge or because they are not true the remaining allegations in paragraph 68.**

69.     The members of the Householder Enterprise worked closely with FirstEnergy, FirstEnergy Service and the Individual Defendants to defeat the attempted referendum of HB 6. During this period, the Individual Defendants caused FirstEnergy and/or FirstEnergy Service to pay the Householder Enterprise over $38 million. For example, on October 10, 2019, FirstEnergy wire transferred $10 million to Energy Pass-Through, which then wired $10 million to Generation Now, as detailed in Paragraphs 169-170 (pages 55-56) of the Criminal Complaint.

**Mr. Dowling admits, upon information and belief, that on October 10, 2019, FirstEnergy Service Company transferred $10,000,000 to an entity, which then transferred $10,000,000 to Generation Now and that on October 18, 2019, FirstEnergy Service Company transferred $10,000,000 to an entity, which then**

**transferred $3,00,000 to Generation Now on October 22, 2019. Mr. Dowling avers that Paragraph 69 purports to reference the Criminal Complaint, which speaks for itself. Mr. Dowling incorporates by reference his responses to any paragraph that purports to rely on the Charging Documents. To the extent remaining allegations in paragraph 69 refer to actions by Mr. Dowling, the allegations are denied. Further answering, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 69, and therefore denies the same.**

70.     The efforts to prevent a referendum of HB 6 and blatantly deny Ohio voters their constitutional rights were successful. On October 21, 2019, the Ballot Campaign failed to collect enough signatures and HB 6 went into effect. While a $60 million bribe may seem extraordinary, it drove a return on investment the likes of which few investors ever see. Not only were the former subsidiaries of FirstEnergy afforded a subsidy - not a bailout as will be discussed below - FirstEnergy received other financial benefits, and the ratepayers saw other financial damages, which were not widely discussed in the media, let alone largely understood in the General Assembly. FirstEnergy got what it wanted because of its bribes and brutality.

**Mr. Dowling, upon information and belief, states that the referendum campaign failed to collect enough signatures and HB 6 went into effect. Mr. Dowling also avers that HB 6 speaks for itself. To the extent the allegations in paragraph 70 refer to actions by Mr. Dowling, the allegations are denied. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 70, and are therefore denies the same.**

71.     FirstEnergy likes to publicly claim that it did not receive the $150 million per year nuclear subsidies. While this assertion may be true at one level, it belies the fact that FirstEnergy was a significant party in the bankruptcy of its nuclear subsidiaries. FirstEnergy had hoped that it would be able to spin the two power plants into bankruptcy with over $1 billion in debt and still more clean-up liabilities, but the Bankruptcy Court would have none of this. The Bankruptcy Court initially refused to approve the initial plan of distribution in April 2019. This resulted in an August 2019 settlement between FirstEnergy and FirstEnergy Solutions, pursuant to which FirstEnergy

paid $225 million in cash to FirstEnergy Solutions and issued $628 million in notes to FirstEnergy. The fact that FirstEnergy Solutions, later Energy Harbor, stood to receive $1.3 billion in future revenues from the nuclear subsidies likely avoided the same obligation on the part of FirstEnergy to provide that much more to its former subsidiary in bankruptcy.

**Mr. Dowling avers that the August 2019 bankruptcy settlement speaks for itself. Mr. Dowling denies for want of knowledge or because they are not true the remaining allegation in paragraph 71.**

72.     Although FirstEnergy prefers to refer to the ratepayer charges for the nuclear energy plants as a bailout, essentially equivalent to the plants' losses, that is incorrect because the payments significantly exceeded the anticipated losses. Transmission grid operator, PJM, which includes all of the Ohio grid, provided an analysis that demonstrated that the profitability of the Davis Besse and Perry Nuclear Power Plants, after the subsidy, will be between $28 million and $44 million per year. https://www.ohiomfg.com/wp-content/uploads/HB-6-Memo-on-Nuclear-Plant-Revenue-7.16.19-JS-rev.pdf.

**Mr. Dowling avers that paragraph 72 purports to reference a PJM analysis, which speaks for itself. Mr. Dowling denies for want of knowledge or because they are not true the remaining allegations in paragraph 72.**

73.     Further evidence of the fact that the so-called bailouts were far more than might have been necessary if the nuclear plants were indeed failing is that almost immediately after emerging from bankruptcy, Energy Harbor repurchased $800 million of stock, meaning that after it exited bankruptcy, after swindling its employees, unions and creditors of billions of dollars, it had $800 million of excess capital on hand before it received a single dollar of the subsidy/bailout contained in HB 6. https://www.cleveland.com/open/2020/05/with-ohio-bailout-law-secured-firstenergy-solutions-successor-moves-to-increase-share-buybacks-by-300-million.html.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73, and therefore denies the same.**

74. In addition, a last-minute change to HB 6 permitted FirstEnergy to charge its customers for more than its lost revenue. FirstEnergy and others refer to this benignly as "decoupling." The Ohio Manufacturers' Association ("OMA") has estimated that FirstEnergy could receive $355 million in unearned revenue through 2024, and as much as an additional $400 million on top of that thereafter. https://ohiomfg.informz.net/ohiomfg/data/images/-%20OMA%20MEMO%20-%20HB%206%20Decoupling%20-%20FINAL%20(Aug.%2014,%202020).pdf. The "decoupling" provision ensures that FirstEnergy will receive distribution rates for residential and commercial customers which, ultimately, are above and beyond its costs and a reasonable rate of return. According to the OMA:,

> H.B. 6 has well-documented provisions that affect Ohio's nuclear power plants, coal power plants, select solar power plants, and energy efficiency requirements. Less well documented, let alone understood, is a confusing decoupling provision in the bill. This provision is written opaquely even for an industry professional, and its meaning is almost certainly incomprehensible to the public. Fortunately, FirstEnergy's CEO put the effect of the provision in plain language for its investors:
>
> "essentially it takes about one-third of our company and I think makes it somewhat recession-proof" [citing https://www.utilitydive.com/news/firstenergy-nears-proposal-to-decouple-ohio-utility-revenues-electricity-c/566610/]

As a result of this decoupling provision, FirstEnergy could collect about $355 million in unearned revenue through 2024. Ratepayers will incur higher electricity costs with no associated benefits. Moreover, a unilateral ruling from the PUCO could extend FirstEnergy's decoupling at the utility's discretion. This could, for example, cost FirstEnergy customers an additional $400 million if extended from 2025 through 2030.

**Mr. Dowling avers that Paragraph 74 purports to reference HB 6 and selectively quote the Ohio Manufacturers' Association, including a quote from FirstEnergy Corp.'s former CEO, which speak for themselves. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 74, and therefore denies the same.**

43

75. In exchange for enormous benefits conferred upon FirstEnergy by HB 6, this legislation also included an extension of a euphemistically-named "legacy generation cost recovery" mechanism. The Ohio Valley Electric Corporation ("OVEC") operates two relatively ancient and inefficient coal plants. Prior to HB 6, all or most of the other electrical providers in Ohio owned part of OVEC and purchased electricity from them. Those distribution companies' customers paid a fee to subsidize the OVEC coal plants. HB 6 extended the fee to First Energy customers who have nothing to do with the coal plants. The perversity of HB 6 is compounded by the fact that PJM has estimated that the net effect of keeping FirstEnergy's two nuclear plants in service (and the anticipated reduction in planned, more-efficient natural gas plants coming on line) will result in $164 million of increased energy expenses across the entire 13 state PJM network, of which $16 million will be shouldered by Ohio ratepayers in addition to the $150 million annual nuclear subsidy. https://www.cleveland.com/open/2020/05/with-ohio-bailout-law-secured-firstenergy-solutions-successor-moves-to-increase-share-buybacks-by-300-million.html at p.11.

**Ms. Dowling avers that Paragraph 75 purports to reference HB 6 and a PJM estimation, which speak for themselves. Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 75, and therefore denies the same.**

76. It is conceivable (or even likely) that Ohio's General Assembly will attempt some form of "repeal and replace" of HB 6, a matter widely discussed in the media and among legislators. Defendants will most certainly argue that this will break the link between the FirstEnergy/Householder bribery scandal and the damages complained of herein. But the indelible stain of HB 6 cannot be washed away so easily. FirstEnergy's bribery scheme propelled into office ten legislators (Brian Baldridge, Jamie Callender, Jon Cross, Brett Hillyer, Don Jones, Jena Powell, Tracy Richardson, Bill Roemer, J. Todd Smith and Shane Wilken)

https://www.cleveland.com/open/2020/07/who-is-team-householder-the-candidates-larry-householder-recruited-to-help-him-become-ohio-house-speaker.html, who were hand-picked and financially supported by Householder. Nine of these ten House members voted in favor of HB 6 and all of them remain in the legislature. Householder himself, as well as his campaign for the Speakership, benefited significantly from the bribery scandal and he, too, remains a member of the House of Representatives. In addition, Householder selected and the House appointed eight legislators (Mark Fraizer, Cindy Abrams, Haraz Ghanbari, Gil Blair, Jeff LaRe, Jason Stephens, D.J. Swearingen, and Al Cutrona) to replace several who variously were elected or appointed to the Senate, who retired or passed away. As anyone who has ever served in the House well knows, when it comes to appointing a replacement to a House seat, there is only one real vote and it belongs to the Speaker. Therefore, at least 19 members of the House are so deeply tainted by the FirstEnergy bribery scandal that any "replacement" of HB 6 which requires their votes would not free the legislation from the taint and would not break the causation chain.

**Mr. Dowling denies the allegations in paragraph 76 to the extent they refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 76, and therefore denies the same.**

77.     The Ohio Legislature may well repeal and replace HB 6. But having hijacked Ohio's democracy and damaged Ohio's trust of an elected government, FirstEnergy, FirstEnergy Service, and the Individual Defendants are not entitled to "keep the change" of their ill-gotten gains, and also remain liable for the costs to ratepayers proximately caused by their unlawful conduct alleged herein.

**Mr. Dowling denies the allegations in paragraph 77.**

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action as a class action under Rules 23(a), (b)(1)(A), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the other members of the Class, which is defined as: All persons and entities resident in the State of Ohio who have and/or will have to pay a monthly surcharge for electric service pursuant to HB 6.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78, and therefore denies the same.**

79.     Based on information and belief, the members of the Class exceed tens of thousands of Ohio residents and ratepayers, making joinder of all Class members impracticable.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79, and therefore denies the same.**

80.     The claims set forth in this Consolidated Complaint are common to each member of the Class. Plaintiffs and each Class member are subject to the same rate increases set forth in HB 6.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80, and therefore denies the same.**

81.     There are questions of law and/or fact common to the Class which predominate over any questions effecting individual members of the Class. These include: (a) whether FirstEnergy, FirstEnergy Service and/or the Individual Defendants bribed the members of the Householder Enterprise to obtain nuclear power plant bailout legislation, HB 6; (b) whether the conduct set forth in this Consolidated Complaint violated RICO and/or the OCRA; (c) whether the Class members are entitled to actual damages, punitive damages, statutory damages, or both; and (d) whether Defendants' conduct entitles the Class to recovery of attorneys' fees and expenses.

**Mr. Dowling denies the allegations in paragraph 81 to the extent they refer to actions by him. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 81, and therefore denies the same.**

82.     Plaintiffs are adequate representatives of the Class members because they are members of the Class, the claims they assert in the Consolidated Complaint are typical of the claims of the Class members, Plaintiffs' claims are not subject to any unique defenses, and Plaintiffs' interests do not conflict with those of any other Class member.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82, and therefore denies the same.**

83.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with any interest of the Class.

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83, and therefore denies the same.**

84.     The federal and state law claims set forth in this Consolidated Complaint are proper for certification as a class action under the provisions of Rule 23.

**Mr. Dowling denies the allegations in paragraph 84 for want of knowledge or because they are not true.**

85.     After addressing the questions common to the Class, only the determination of individual damages will remain, and that calculation is one of simple mathematics using the records maintained by the Defendants.

**Mr. Dowling denies the allegations in paragraph 85 for want of knowledge or because they are not true.**

86.     This class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because there are tens of thousands of members in the proposed Class and repeated individual discovery and litigation of the common issues shared by all Class members would needlessly waste judicial resources. The names and addresses of Class members will be readily identifiable from records of Defendants and through discovery in this action.

**Mr. Dowling denies the allegations in paragraph 86 for want of knowledge or because they are not true.**

87.     The Class members' interests in individually controlling the prosecution of separate actions do not outweigh the benefits of class-based litigation on those issues.

**Mr. Dowling denies the allegations in paragraph 87 for want of knowledge or because they are not true.**

88.     It is desirable to concentrate the litigation of these claims in one forum. Any difficulty in managing this case as a class action is outweighed by the immense benefits the class action has in efficiently disposing of common issues of law and fact among the large number of litigants. Moreover, no Class member has enough at stake to warrant individual litigation against these obviously well-funded and ruthless defendants.

**Mr. Dowling denies the allegations in paragraph 88 for want of knowledge or because they are not true.**

89.     The prosecution of this civil action by all Class members individually in separate actions would create a risk of inconsistent or varying adjudications of claims by the individual Class members that would establish incompatible standards of conduct for Defendants, could be dispositive of interests of other Class members not parties to the adjudications, or substantially impair or impede Class members ability to protect their interests.

**Mr. Dowling denies the allegations in paragraph 89 for want of knowledge or because they are not true.**

90.     Further, Plaintiffs have retained competent counsel experienced in class action litigation to further insure such representation and protection of the Class. Plaintiffs and their counsel intend to vigorously prosecute this action.

**Mr. Dowling denies the allegations in paragraph 90 for want of knowledge or becaue they are not true.**

91.     Managing this case as a Class Action should not present any particular difficulty.

48

**Mr. Dowling denies the allegations in paragraph 91 for want of knowledge or because they are not true.**

## COUNT ONE

## VIOLATIONS OF FEDERAL RICO AND OHIO CORRUPT ACTIVITY ACT (18 U.S.C. § 1962(C) & (D) AND OHIO REV. CODE § 2923.32(A)(1))

92.     Paragraphs 1-91 of this Consolidated Complaint are realleged and incorporated by reference. Count One is asserted against each of the Individual Defendants, FirstEnergy, and FirstEnergy Service for violations of RICO and the OCRA.

**Mr. Dowling incorporates his previous responses by reference. Mr. Dowling denies any remaining allegation in paragraph 92.**

93.     At all times relevant to this action, Plaintiffs Smith, Buldas, Hudock and Cameo, and each of them, has been a natural person and, as such, is a "person" within the meaning of 18 U.S.C. § 1961(3) and OHIO REV. CODE § 2923.31(G).

**Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93, and therefore denies the same.**

94.     At all times relevant to this action, Defendants FirstEnergy and FirstEnergy Service are and have been corporate entities and, as such, are "persons" within the meaning of 18 U.S.C. § 1961(3) and OHIO REV. CODE § 2923.31(G). At all times relevant to this action, the Individual Defendants, and each of them, has been a natural person and, as such, each of them is a "person" within the meaning of 18 U.S.C. § 1961(3) and OHIO REV. CODE § 2923.31(G).

**Mr. Dowling, upon information and belief, states that FirstEnergy and FirstEnergy Service are corporations. Further answering, Mr. Dowling is a natural person. Otherwise, Mr. Dowling is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 94, and therefore denies the same.**

95.     At all times relevant to this action, FirstEnergy and FirstEnergy, as corporate entities, both individually and acting together, constituted an "enterprise," as that term is defined in 18 U.S.C. § 1961(4) and OHIO REV. CODE § 2923.31(C). This RICO and OCRA enterprise is

referred to in this Consolidated Complaint as the "FirstEnergy Enterprise." The Individual Defendants, and each of them, as individual persons and as corporate officers, are separate and distinct from FirstEnergy, FirstEnergy Service, and the FirstEnergy Enterprise. At all times relevant to this action and for the reasons set forth in the Criminal Complaint and in the Indictment, the Householder Enterprise also constituted an "enterprise" under RICO and OCRA. As alleged in this Consolidated Complaint, FirstEnergy, FirstEnergy Service, the Individual Defendants, and the members of the Householder Enterprise constituted a group of persons associated in fact, and this enterprise is referred to herein as the "FirstEnergy-Householder Enterprise."

**Mr. Dowling denies the allegations in paragraph 95.**

96.     In violation of Section 1962(c) and (d) of RICO, and in violation of Section 2923.32(A)(1) of OCRA, the Individual Defendants conducted the affairs of the FirstEnergy Enterprise through a pattern of racketeering activity and a pattern of corrupt activity and/or conspired to do so. In violation of the same statutory provisions, FirstEnergy, FirstEnergy Service, and the Individual Defendants conducted the affairs of the FirstEnergy-Householder Enterprise through a pattern of racketeering activity and a pattern of corrupt activity and/or conspired to do so.

**Mr. Dowling denies the allegations in paragraph 96.**

97.     The purpose(s) of the FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise was to secure legislation favorable to FirstEnergy and FirstEnergy Service through the illicit and unlawful payments that the Individual Defendants caused FirstEnergy and/or FirstEnergy Service to pay, as alleged in this Consolidated Complaint and in the Criminal Complaint and the Indictment.

**Mr. Dowling denies the allegations in paragraph 97.**

50

98. The FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise have been engaged in (since approximately 2017) and continue to be engaged in, activities that affect interstate commerce. These RICO and OCRA enterprises have been and remain longstanding, continuous, and open-ended. The Individual Defendants, FirstEnergy, and FirstEnergy Service have engaged in a pattern of racketeering activity and a pattern of corrupt activity, as described in this Consolidated Complaint, in the Criminal Complaint, and in the Indictment, including, but not limited to, the extensive use of the U.S. mails and/or interstate wire facilities on different dates, to bribe Householder and/or other elected representatives to pass nuclear plant bailout legislation (HB 6), defeat the Ballot Campaign (anti-HB 6 referendum effort), and expand Householder's power to enable HB 6 to be passed and the Ballot Campaign defeated.

**Mr. Dowling denies the allegations in paragraph 98.**

## PATTERN OF RACKETEERING ACTIVITY

99. The Individual Defendants, acting individually and collectively and/or in conjunction with and/or coordinated with the members of the Householder Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity and a pattern of corrupt activity.

**Mr. Dowling denies the allegations in paragraph 99**.

100. The Individual Defendants, acting individually and collectively and/or in conjunction with others, devised a scheme to obtain legislation and prevent the repeal of legislation by means of false or fraudulent pretenses and representations, and through the payment of bribes.

**Mr. Dowling denies the allegations in paragraph 100**.

101. The Individual Defendants used the U.S. mails and/or interstate wire facilities and have caused the mails and wires to be used, or reasonably knew the mails and interstate wire facilities would be used, in furtherance of their fraudulent scheme(s) and the payment of bribes in return for the passage of nuclear plant bailout legislation (HB 6) and to prevent its repeal.

**Mr. Dowling denies the allegations in paragraph 101**.

102.    The Individual Defendants have used the mails and/or interstate wire facilities and/or have caused others to use the mails and/or interstate wire facilities, in connection with the payment of bribes for the passage of bailout legislation (the passage of HB 6), fraudulently obtained, and through the use of the mails and interstate wire facilities which has furthered this illegal scheme and enabled FirstEnergy and/or FirstEnergy Service to take money and property from Plaintiffs and Class members by means of false pretenses and representations and the payment of bribes, to obtain the passage of bailout legislation (HB 6) and preventing its repeal.

**Mr. Dowling denies the allegations in paragraph 102**.

103.    On information and belief, each and every one of the Individual Defendants has specific knowledge that the mails and interstate wire facilities are/were being utilized in furtherance of the overall purpose of executing the illegal scheme, and/or it was reasonably foreseeable that the mails and interstate wire facilities would be so used.

**Mr. Dowling denies the allegations in paragraph 103.**

104.    Each separate use of the mails and interstate wire facilities in connection with the scheme(s) described in this Consolidated Complaint, in the Criminal Complaint, and in the Indictment, spanning a period from 2017 to the present, constitutes a separate instance of mail fraud and/or wire fraud and, thus, is also a predicate act of racketeering activity and/or corrupt activity which, taken together, constitute a pattern of racketeering activity and/or a pattern of corrupt activity within the meaning of RICO and/or OCRA. Other predicate acts, including payment of bribes for the passage of HB 6 and the payment of bribes to prevent its repeal are set forth in this Consolidated Complaint, in the Criminal Complaint, and in the Indictment.

**Mr. Dowling denies the allegations in paragraph 104.**

105.    In addition, as alleged in this Consolidated Complaint, in the Criminal Complaint, and in the Indictment, the Individual Defendants, FirstEnergy and/or FirstEnergy Service have engaged in a variety of wrongful acts that constitute racketeering activity and/or corrupt activity, including (a) violations of 18 U.S.C. § 1951, relating to interference with commerce, robbery, or extortion; (b) violations of 18 U.S.C. § 1952 relating to racketeering, including multiple acts of bribery in violation of OHIO REV. CODE § 3517.22(a)(2); (c) violations of 18 U.S.C. §1956, relating to money laundering; (d) violations of 18 U.S.C. § 1957, relating to engaging in monetary transactions in property derived from specified unlawful activity; and (e) multiple acts involving bribery that are chargeable under OHIO REV. CODE § 2921.02.

**Mr. Dowling denies the allegations in paragraph 105.**

## RELATIONSHIP OF PATTERN OF RACKETEERING ACTIVITY AND/OR CORRUPT ACTIVITY TO THE ENTERPRISE(S)

106.    As described in this Consolidated Complaint, in the Criminal Complaint and the Indictment, the goal(s) of the FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise was to obtain the passage of HB 6 through fraudulent, illegal means, through the payment of bribes in order to extract money and property from Plaintiffs and Class members by requiring them to pay a surcharge on their monthly electric utility bills.

**Mr. Dowling denies the allegations in paragraph 106.**

107.    The pattern of racketeering activity and the pattern of corrupt activity described herein was integral to Defendants' scheme or artifice to defraud. Without engaging in mail fraud and wire fraud, the payment of bribes, money laundering, and other federal and state law offenses, FirstEnergy, FirstEnergy Service, and the Individual Defendants would be unable to obtain passage of HB 6.

**Mr. Dowling denies the allegations in Paragraph 107.**

108.    As a direct and proximate result of the violations of RICO and/or OCRA described in this Consolidated Complaint, Plaintiffs and Class members have suffered substantial monetary injuries. Plaintiffs and Class members have and/or will pay monthly surcharges that range from 85 cents per month for residential customers to $2,400 per month for commercial customers operating large industrial plants, thus constituting an injury to Plaintiffs and Class members within the meaning of 18 U.S.C. § 1964(c) and/or OHIO REV. CODE § 2923.34(E).

**Mr. Dowling denies the allegations in Paragraph 108.**

## COUNT TWO

## CIVIL CONSPIRACY

109.    Paragraphs 1-108 of this Consolidated Complaint are realleged and incorporated by reference. Count Two is asserted against each of the Defendants.

**Mr. Dowling incorporates his previous responses by reference. Mr. Dowling denies any remaining allegation in paragraph 109.**

110.    Defendants have engaged in a civil conspiracy to unlawfully injure Plaintiffs and Class members. Their actions evidence a malicious combination with the purpose of causing injury to the property of Plaintiffs and Class members in a way not competent for one alone, resulting in actual damages.

**Mr. Dowling denies the allegations in paragraph 110.**

111.    Apart from liability for a conspiracy to engage in violations of RICO and/or OCRA, and independent of those violations, the actions of Defendants FirstEnergy, FirstEnergy Service, and the Individual Defendants described in this Consolidated Complaint demonstrate a civil conspiracy with one or more members of the Householder Enterprise under state law to commit fraud, theft, and the other illegal activities previously described, including the scheme to obtain

legislation and prevent the repeal of legislation by means of false or fraudulent pretenses and representations, and through the payment of bribes.

**Mr. Dowling denies the allegations in paragraph 111.**

112.    The unlawful or tortious acts of Defendants FirstEnergy, FirstEnergy Service, and the Individual Defendants are attributable to one another. All Defendants have agreed to and acted in pursuance of a common plan or design to commit unlawful or tortious acts, actively took part in it, and ratified and adopted the wrongdoer's act done for their benefit.

**Mr. Dowling denies the allegations in paragraph 112.**

113.    Plaintiffs and Class Members have been proximately injured as a result of Defendants' civil conspiracy.

**Mr. Dowling denies the allegations in Paragraph 113.**

## COUNT THREE

## INJURY THROUGH CRIMINAL ACTS

114.    Paragraphs 1-113 of this Consolidated Complaint are realleged and incorporated by reference. Count Three is asserted against each of the Defendants.

**Mr. Dowling incorporates his previous responses by reference. Mr. Dowling denies any remaining allegation in paragraph 114.**

115.    As alleged in this Consolidated Complaint, Plaintiff and the members of the Class have been injured in their person or property by Defendants' criminal acts including, but not limited to, bribery and wire fraud. Under the provisions of OHIO REV. CODE § 2307.60(A)(1), Plaintiffs and Class members are entitled to recover damages, costs of suit, attorneys' fees, and punitive damages.

**Mr. Dowling denies the allegations in paragraph 115.**

## COUNT FOUR

## UNJUST ENRICHMENT

116.    Paragraphs 1-115 of this Consolidated Complaint are realleged and incorporated by reference. Count Four is asserted against Defendants FirstEnergy and FirstEnergy Service.

**Mr. Dowling incorporates his previous responses by reference.**

117.    By their receipt and retention of the monthly surcharges paid by Plaintiffs and Class members and by otherwise unjustly benefiting from their unlawful conduct, as described in this Consolidated Complaint, Defendants FirstEnergy and/or FirstEnergy Service have been unjustly enriched at the expense of Plaintiffs and Class members. Accordingly, Defendants FirstEnergy and/or FirstEnergy Service hold all such funds in a constructive trust for the benefit of Plaintiffs and Class members.

**Count Four is not asserted against Mr. Dowling and, therefore, no response is required. To the extent a response is required, the allegations are denied.**

## COUNT FIVE

## NEGLIGENCE AND/OR GROSS NEGLIGENCE

118.    Paragraphs 1-117 of this Consolidated Complaint are realleged and incorporated by reference. Count Five is asserted against each of the Defendants.

**Mr. Dowling incorporates his previous responses by reference. Mr. Dowling denies any remaining allegation in paragraph 118.**

119.    Defendants owed Plaintiffs and Class members duties, including, but not limited to:

(a)    The duty to uphold the public trust;

(b)    The duty to abide by internal policies and procedures relating to political action;

(c)    The duty to undertake political action in a reasonable and legal manner;

(d)    The duty to protect customer funds against misuse;

56

(e)     The duty to use customer funds appropriately and only as allowed by law;

(f)     The duty to abide by internal policies and procedures related to company assets; and

(d)     Such other duties as may be revealed during discovery and/or trial of this matter.

**Mr. Dowling denies the allegations in Paragraph 119.**

118.    As set forth above, Defendants have breached their duties to Plaintiffs and Class members in one or more of the following ways:

(a)     Engaging in reckless and illegal political action contrary to the best interest of Ohioans;

(b)     Abusing public trust;

(c)     Abusing a position of power;

(d)     Paying, or facilitating the payment of, bribes and kickbacks and engaging in other illegal conduct for the purpose of, or that resulted in, securing passage and implementation of HB 6;

(e)     Delegitimizing the function of the legislature;

(f)     Unjustly depriving all Ohio utility customers of billions of dollars of cost savings;

(g)     Unjustly denying Ohioans the benefit of billions of dollars in savings and investment in energy efficiency measures and technology;

(h)     Coverting customer funds from their ordinary use;

(i)     Misusing customer funds to engage in illegal and fraudulent lobbying and political action;

(j)     Violating internal policies and procedures related to good faith and fair dealing;

(k)      Violating internal policies and procedures related to political action;

(l)      Engaging in political action contrary to the best interest of customers;

(m)      Failing to train employees, managers, personnel and authorized agents on policies and procedures;

(n)      In the event such training occurred, failing to adequately monitor and/or implement policies and procedures;

(o)      Abusing customer loyalty and trust;

(p)      Paying, or permitting the payment of, bribes and kickbacks and engaging in, or facilitating the engagement of, other illegal conduct for the purposes of securing passage and implementation of HB 6;

(q)      Violating statutory prohibitions against unfair or deceptive business practices;

(r)      Requiring Plaintiffs and the Class to pay for inflated revenues that did not correspond to actual use or need; and

(s)      Such other particulars as may be revealed during discovery and/or trial.

**Mr. Dowling denies the allegations in Paragraph 118.** [2]

119.      Defendants engaged in the conduct set forth above knowingly and/or with a reckless or negligent disregard for the impact on Plaintiffs and the Class members.

**Mr. Dowling denies the allegations in Paragraph 119.**

---

[2] The Consolidated Complaint has two paragraphs numbered 118. Additionally, "119" appears within the first paragraph 118 signaling an additional paragraph 119. Mr. Dowling's answers are in the same order of the allegations in the Consolidated Complaint.

120.    As a direct and proximate cause of Defendants' conduct, Plaintiffs and Class members have suffered and will continue to suffer substantial losses and are entitled to judgment against Defendants for all actual damages, including costs associated with or affected by the implementation of HB 6, along with punitive damages, prejudgment interest, and such other damages as may be determined at trial.

**Mr. Dowling denies the allegations in Paragraph 120.**

## PRAYER FOR RELIEF

The remainder of the Consolidated Complaint contains Plaintiffs' prayer for relief, to which no response is required. To the extent one is required, Mr. Dowling denies any allegations in Plaintiffs' prayer for relief and further avers that Plaintiffs are not entitled to the relief sought, or any relief, in this action.

Unless expressly admitted herein, each and every allegation in the Consolidated Complaint is denied.

## SEPARATE DEFENSES

1.    Plaintiffs' Consolidated Complaint should be dismissed for failure to state a claim upon which relief can be granted.

2.    Plaintiffs' claims are barred to the extent that Plaintiffs lack standing to assert any of the causes of action or requests for relief contained in the Complaint.

3.    Plaintiffs' claims are barred by the filed-rate doctrine.

4.    Plaintiffs' claims are barred to the extent that there is no cognizable legal injury, including no injury, loss, or damage.

5.      Plaintiffs' Consolidated Complaint should be dismissed on the ground that Plaintiffs may have failed to join necessary and indispensable parties under Federal Rule of Civil Procedure 19.

6.      Plaintiffs' claims are barred to the extent that Mr. Dowling does not owe a statutory or common law duty to Plaintiffs.

7.      Plaintiffs' claims are barred by the First Amendment of the United States Constitution.

8.      Plaintiffs' claims are barred by Section 11 of the Ohio Constitution.

9.      Plaintiffs' claims against Mr. Dowling under 18 U.S.C. § 1962(c) and (d) and Ohio Rev. Code § 2923.32(A)(1) are barred because he was not employed by or associated with an "enterprise," as that term is defined in 18 U.S.C. § 1961(4) and Ohio Rev. Code § 2923.31(C).

10.      Plaintiff's claims against Mr. Dowling under 18 U.S.C. § 1962(c) and (d) and Ohio Rev. Code § 2923.32(A)(1) are barred because he did not conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity, nor did he conspire to do so.

11.      Plaintiffs' claims against Mr. Dowling under 18 U.S.C. § 1962(c) and (d) and Ohio Rev. Code § 2923.32(A)(1) are barred because he had no knowledge of an enterprise or its operations.

12.      Plaintiffs' claims against Mr. Dowling under 18 U.S.C. § 1962(c) and (d) and Ohio Rev. Code § 2923.32(A)(1) are barred because he did not intend to participate in an enterprise.

13.      Plaintiffs' claims against Mr. Dowling under 18 U.S.C. § 1962(c) and (d) and Ohio Rev. Code § 2923.32(A)(1) are barred because Plaintiffs did not suffer any injuries as a result of the alleged violation of 18 U.S.C. § 1962 or Ohio Rev. Code § 2923.32(A)(1).

14.    Mr. Dowling, as an officer of FirstEnergy, acted within the course and scope of his employment and, therefore, is immune from suit for civil conspiracy.

15.    Plaintiffs' claims are barred for lack of proximate cause.

16.    There is no causal relationship between Mr. Dowling's conduct and the injuries and damages alleged by Plaintiffs in the Consolidated Complaint.

17.    Any alleged injury or damages sustained by Plaintiffs were not proximately caused by Mr. Dowling but by several independent intervening causes.

18.    Plaintiffs' claims may not be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

19.    Mr. Dowling incorporates by reference any defenses asserted by any other defendant to the extent applicable to him.

20.    Mr. Dowling reserves the right to assert additional affirmative defenses at such time and to such extent as warranted by discovery and the factual developments in this case.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Michael J. Dowling demands a trial by jury on all issues in this action triable of right by a jury.

**WHEREFORE**, having fully answered, Defendant Michael J. Dowling prays that the Court enter judgment in his favor, that the Consolidated Complaint be dismissed with prejudice, that Mr. Dowling recover all costs and reasonable attorneys' fees incurred in this action, and that this Court grant any further relief which it deems just and equitable.

DATED:  March 10, 2021                        Respectfully submitted,

                                          */s/ John A. Favret*

John F. McCaffrey (0039486)
John A. Favret (0080427)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH  44113
(216) 592-5000
(216) 592-5009 – Fax
E-Mail:      john.mccaffrey@tuckerellis.com
             john.favret@tuckerellis.com

*Attorneys for Defendant Michael J. Dowling*

## <u>PROOF OF SERVICE</u>

A copy of the foregoing was filed electronically on March 10, 2021.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ John A. Favret\
John A. Favret (0080427)\
*One of the Attorneys for Defendant Michael J.*\
*Dowling*